IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

UNITED STATES OF AMERICA,

Plaintiff,

v.

JOSE LUIS VAELLO-MADERO,

Defendant.

CASE NO. 17-2133 (GAG)

**OPINION AND ORDER**

The United States moves for voluntary dismissal of its claims against José Luis Vaello-Madero arising from erroneous and in excess payments under the Supplemental Security Income (SSI) program. (Docket No. 23). For the reasons discussed below, the United States' motion is **DENIED**.

**I.    Relevant Factual Background**

The following facts are taken from the record and parties' submissions, and are only considered as true for purposes of this motion:

Vaello-Madero lived in New York between 1985-2013. There, he received SSI disability benefits, which were deposited into his New York bank account. (Docket No. 25 ¶¶ 6-8). In July 2013, he moved to Puerto Rico, and continued receiving SSI disability payments through his New York bank account until August 2016. Id. ¶¶ 9, 13. Throughout this time, he was unaware that his relocation would affect his ability to receive SSI disability benefits. Id. ¶ 12.

Vaello-Madero learned he was ineligible for SSI payments in June 2016. Id. ¶ 11. Through two notices that summer, the Social Security Administration (SSA) stopped its SSI payments and

retroactively reduced its payments from August 2013 through August 2016 to $0. (Docket Nos. 32-1 at 2; 25 at 4). Those two notices did not inform Vaello-Madero that he was liable for any overpayments, but stated that the SSA could contact him in the future "about any payments we previously made." (Docket Nos. 32-1 at 2; 25 at 4). More than a year later, the United States commenced an action against Vaello-Madero to collect $28,081.00 in overpaid SSI benefits after he moved to Puerto Rico. Jurisdiction was premised on 28 U.S.C. § 1345 and 42 U.S.C. § 408(a)(4). (Docket No. 1 at 1-2).

The United States and Vaello-Madero, unrepresented by counsel, signed a stipulation for consent judgment less than a week after this case was filed. (Docket No. 3). Nevertheless, represented by Court-appointed pro bono counsel, Vaello-Madero subsequently moved to withdraw the stipulation for consent judgment. (Docket Nos. 5; 19). Vaello-Madero then filed an answer challenging 42 U.S.C. § 408(a)(4), a criminal statute, as a basis for the civil action and attacking the constitutionality of denying SSI benefits to residents of Puerto Rico. (Docket No. 17). In response, the United States moved for voluntary dismissal without prejudice, acknowledging its lack of jurisdiction under 42 U.S.C. § 408(a)(4) and alleging that the Social Security Act's administrative requirements have not been met. (Docket No. 23).

**II.     Discussion**

The United States moves to dismiss without prejudice its claims against Vaello-Madero under Rule 41(a)(2) of the Federal Rules of Civil Procedure. This rule states that "an action may be dismissed at the plaintiff's request only by court order, on terms that the court considers proper." FED. R. CIV. P. 41(a)(2). The United States argues that it made a mistake pleading jurisdiction, and the Court lacks jurisdiction over this case because Vaello-Madero did not exhaust administrative remedies under 42 U.S.C. § 405(g). Vaello-Madero counters that 28 U.S.C. § 1345 confers

jurisdiction and that dismissal without prejudice would be unfair. The Court agrees with Vaello-Madero.

    A.  <u>Subject-Matter Jurisdiction under 28 U.S.C. § 1345</u>

Section 1345 grants the district courts "original jurisdiction of all civil actions, suits or proceedings *commenced by the United States*," unless an act of Congress provides otherwise. 28 U.S.C. § 1345 (emphasis added). It "grants broad jurisdictional power to the district courts over suits when the United States is plaintiff," including actions to determine "the United States' right to obtain restitution of monies wrongfully paid from the public fisc." <u>United States v. Lahey Clinic Hosp., Inc.</u>, 399 F.3d 1, 9, 12 (1st Cir. 2005), <u>cert. denied</u>, 546 U.S. 815 (2005). The Social Security Act's administrative review scheme under 42 U.S.C. § 405(g)-(h) does not defeat jurisdiction under section 1345 when the United States appears as plaintiff. The First Circuit has held that "these statutes do not purport to limit the government's ability to bring a claim . . . under a different grant of jurisdiction," like section 1345. <u>Id.</u> at 14. Hence, "administrative remedies are not exclusive when the United States institutes suit." <u>Id.</u> at 16.

As in <u>Lahey</u>, here the United States sued Vaello-Madero for restitution. Thus, Vaello-Madero was not required to exhaust administrative remedies to bestow the Court with jurisdiction over this case and his affirmative defenses. As stated above, "administrative remedies are not exclusive when the United States institutes suit"; the United States can bring its claim "under a different grant of jurisdiction." <u>Id.</u> at 14, 16. Although not explicitly stated in the complaint, this claim arises "under common law theories of unjust enrichment and payment under mistake of fact," which provides a different grant of jurisdiction for purposes of section 1345. <u>Id.</u> at 3-4. In sum, all that matters here is that the United States brought suit, which "grants broad jurisdictional power" to the Court. <u>Id.</u> at 9. The Court has jurisdiction to address the merits of the United States'

overpayment claim, and the constitutional challenge as an affirmative defense to Vaello-Madero's liability.

B. <u>Unfair Treatment under Rule 41(a)(2)</u>

Rule 41(a)(2) of the Federal Rules of Civil Procedure, governing voluntary dismissals, "protect[s] the nonmovant from unfair treatment . . . [which] can take numerous forms." <u>Colon-Cabrera v. Esso Standard Oil Co. (Puerto Rico)</u>, 723 F.3d 82, 88 (1st Cir. 2013). Among many factors, the Court may "consider whether 'a party proposes to dismiss the case at a late stage of pretrial proceedings, or seeks to avoid an imminent adverse ruling.'" <u>Id.</u> (citing <u>In re FEMA Trailer Formaldahyde Prods. Liab. Litig.</u>, 628 F.3d 157, 162 (5th Cir. 2010)). Moreover, "[a] plaintiff should not be permitted to force a defendant to incur substantial costs in litigating an action, and then simply dismiss his own case and compel the defendant to litigate a wholly new proceeding." <u>Id.</u>

Dismissing this suit without prejudice would unfairly harm Vaello-Madero. It could burden him with more legal proceedings under the SSA's administrative scheme—potentially returning his case to where it is today, but months, maybe years, from now. Also, the case should not be dismissed considering the possibility that the United States merely "seeks to avoid an imminent adverse ruling" regarding the constitutional issue at stake. <u>Id.</u> (citing <u>In re FEMA</u>, 628 F.3d at 162).

The United States' legal capacity to discriminate against residents of Puerto Rico in healthcare and other federal programs, including SSI, stems from a brief per curiam Supreme Court opinion that recently "celebrated" its fortieth anniversary. See <u>Califano v. Torres</u>, 435 U.S. 1 (1978). This case and its sequel, <u>Harris v. Rosario</u>, permit Congress to discriminate in extending these benefits to Puerto Rico "so long as there is a rational basis for its actions." <u>Harris v. Rosario,</u>

446 U.S. 651 (1980). The rational basis for discrimination identified by the Court in Califano and Harris was that: "Puerto Rican residents do not contribute to the federal treasury; the cost of treating Puerto Rico as a State under the statute would be high; and greater benefits could disrupt the Puerto Rican economy." Harris, 446 U.S. at 652.

The Court does not need to dive deep into "the quagmire of Puerto Rican status litigation" to explain why an adverse ruling for the United States despite these precedents is possible. United States v. Lopez Andino, 831 F.2d 1164, 1172 (1st Cir. 1987) (Torruella, J., concurring). Such an adverse ruling, departing from precedent, would resemble how Plessy v. Ferguson was overturned in Brown v. Board of Education. 163 U.S. 537 (1896); 347 U.S. 483 (1954). Federal courts could find that the proposed "rational" reasons are actually "irrational," or opt to apply a heightened standard of scrutiny. While, of course, only the Supreme Court can leave Califano and Harris without effect, constitutional litigation must commence at the district court level and work its way up.

Recent developments concerning Puerto Rico, for example, increased awareness of its plight in the mainland after Hurricane María as well as national and local consensus against such disparate treatment, could further encourage the courts to revisit Califano and Harris. For starters, the proposition stated in Harris that "Puerto Rican residents do not contribute to the federal treasury" is erroneous. Harris, 446 U.S. at 652. True, "Puerto Rico residents generally are exempt from federal taxes on income from Puerto Rico sources." U.S. Gov't Accountability Off., GAO-14-31, Puerto Rico: Information on How Statehood Would Potentially Affect Selected Federal Programs and Revenue Sources 7 (2014). But as the Government Accountability Office states: "Puerto Rico's residents have access to many federal programs *and are subject to certain federal tax laws*." Id. at 2 (emphasis added). For example, residents of Puerto Rico pay federal payroll

taxes to finance Social Security and Medicare, equally to their stateside brethren. See Consejo de Salud Playa de Ponce v. Rullán, 586 F. Supp. 2d 22, 38 (D.P.R. 2008). Regardless, "for some federal programs, Puerto Rico or its residents are subject to different requirements or funding rules than are the states or their residents." U.S. Gov't Accountability Off., Puerto Rico, supra, at 2. Such is the case with SSI.

Scholar Arnold Leibowitz notes significant shortcomings in the Supreme Court's rational-basis review. For example, although Puerto Rico does not contribute to the federal treasury exactly as a state, "Congress has discriminated against citizens in the territories *regardless* of income tax payments." Arnold H. Leibowitz, Defining Status 30-31 (1989) (emphasis added). For example, in 1916, the Federal Aid Highway Act did not extend a matching-funds benefit to the Territory of Alaska, which paid federal taxes, but did to Hawaii, which also paid, and Puerto Rico, which did not. Id. at 31. Another inconsistency concerns the cost of extending equal welfare benefits to Puerto Rico. According to Leibowitz, this is a consideration "which no State citizen would be subjected to." Leibowitz, Defining Status, supra, at 31. Indeed, when has Congress considered the cost of a statute's application in a single state, enacted the statute, and refused to apply it for the citizens of that particular state? If Puerto Rico had been treated equally for purposes of SSI in 2011, federal spending for the program would have ranged from $1.5 billion to $1.8 billion. U.S. Gov't Accountability Off., Puerto Rico, supra, at 82. These are pennies in the bucket of a $3.8 trillion budget, especially when one considers that it would have improved the quality of life of up to 354,000 individuals. Id.

Hurricane María provides another reason why federal courts could revisit Harris and Califano. The hurricane blew away the mainland's lack of awareness regarding the inequality that United States citizens suffer just for residing in Puerto Rico. As First Circuit Court of Appeals

Judge Juan R. Torruella points out in the Harvard Law Review Forum, "[i]f there is a silver lining to be found within the catastrophic impact of Hurricane María on the Island of Puerto Rico, it is that the barrage of news generated by that unfortunate event has served to inform the rest of the nation that Puerto Rico is a 'part of the United States' and that its residents are 'citizens of the United States.'" Juan R. Torruella, Why Puerto Rico Does Not Need Further Experimentation with Its Future: A Reply to the Notion of "Territorial Federalism," 131 Harv. L. Rev. F. 65, 67 (2018). This newfound awareness could trigger juridical change as other American citizens learn of the limits imposed on their rights due to anachronistic historical and geographical quirks dating to precedents established by the same Supreme Court that decided Plessy.

The belief that the discriminatory duo of Califano and Harris should be revisited transcends local politics—an unusual circumstance. For example, Puerto Rico former Governor Pedro J. Rosselló argues against excluding United States citizens residing in Puerto Rico from equal treatment in federal programs like SSI. "This exclusion results in major curtailment of civil and socioeconomic rights of a discrete group of citizens, based solely and artificially on geographic residence." Pedro J. Rosselló, Foreword to Gustavo A. Gelpí, The Constitutional Evolution of Puerto Rico and Other U.S. Territories (1898 – Present) 24 (2017). As a result, this exclusion deprives these citizens from "equal protection under the law for multiple socioeconomic programs, such as Medicaid, Supplemental Security Income Program, Aid to Families with dependent children, among others." Id.

Rosselló's predecessor, former Governor Rafael Hernández Colón, concurs. He criticizes Califano and Harris by stating that "one must understand that the rational criteria utilized by the U.S. Supreme Court—which allowed for discrimination in Califano and Harris—overlooked the racial premises permeating the Insular Cases." Rafael Hernández Colón, The Evolution of

Democratic Governance under the Territorial Clause of the U.S. Constitution, 50 Suffolk U. L. Rev. 587, 606 (2017). The controversial Insular Cases, decided in the early 1900s, created the framework of incorporated and unincorporated territories, where the former are destined for statehood and the latter are not necessarily. Whatever pros and cons may have evolved from such framework, the fact remains that they were grounded on outdated premises. As former U.S. Attorney General Richard Thornburgh explains, "the 'alien race' of the inhabitants in the far-flung territories acquired from Spain . . . was pivotal to the reasoning behind the bold imperialist doctrine formulated by the Court." Richard Thornburgh, Puerto Rico's Future 47 (2007). Hence, as Justice Marshall denounced in Harris, "the present validity of those decisions is questionable." Harris, 446 U.S. at 653 (Marshall, J., dissenting).

Yet another former executive agrees that Puerto Rico's unequal treatment is at least part of the equation behind Puerto Rico's current fiscal and economic crisis. Former Governor Aníbal Acevedo Vilá denounces that, "Congress sometimes excludes Puerto Rico from laws that would benefit it, while also denying the same level of funding that the fifty states get to enjoy with regards to their specific financial situations or to fund federally-mandated programs." Aníbal Acevedo Vilá, With Plenary Powers Comes Plenary Responsibility: Puerto Rico's Economic and Fiscal Crisis and the United States, Rev. Jur. UPR 729, 742 (2016). Hence, three governors with different views regarding Puerto Rico's ultimate political status all coincide as to the injustice sanctioned by Califano and Harris. Their collective experience of twenty-four years indeed carries significant weight.

Califano and Harris, and the ensuing forty years of discrimination upheld under rational-basis review, may be ripe for reconsideration. "Bureaucratic inertia, combined with the powerlessness and distance of the territories" has given this discriminatory treatment a lifespan

that approaches Plessy's. Leibowitz, Defining Status, supra, at 31. But the reality is that these cases were decided "without benefit of briefing or argument," as Justice Marshall warned, or worse, without even the benefit of the government of Puerto Rico participating in the case and being heard. Harris, 446 U.S. at 654 (Marshall, J., dissenting). Circumstances surrounding Puerto Rico have changed. There is increased national awareness of its existence and political consensus against its disparate treatment. As a result, federal courts could now conclude that heightened scrutiny is "a proposition [that] surely warrants [their] full attention," potentially leading to an adverse result for the United States. Id.; see also Hernández-Colón, The Evolution, supra, at 606 ("Elemental principles of fairness and equal protection demand that such distinctions drawn by Congress in the application of federal programs to Puerto Rico and other nonstate areas should be subject to strict scrutiny.").

Hence, the Court agrees with Vaello-Madero that the United States' voluntary dismissal "raises the prospect that the United States might be trying to abandon its chosen forum in response to what it might perceive as a serious setback." (Docket No. 25 at 12). The Court will not allow the United States to avoid judicial review of an unsympathetic topic using jurisdictional pretexts. Therefore, the United States' motion for voluntary dismissal at Docket No. 23 is **DENIED**.

**SO ORDERED.**

In San Juan, Puerto Rico this 14th day of May, 2018.

*s/ Gustavo A. Gelpí*
GUSTAVO A. GELPI
United States District Judge