**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO**

| | |
|---|---|
| **UNITED STATES OF AMERICA,**<br>**Plaintiff,**<br>**v.**<br>**JOSE LUIS VAELLO MADERO,**<br>**Defendant.** | **CIVIL NO. 17-2133 (GAG)** |

**COMMONWEALTH OF PUERTO RICO'S AMICUS BRIEF**

TO THE HONORABLE COURT:

COMES NOW amicus curiae Commonwealth of Puerto Rico, and without waving any right arising from Title III of the Puerto Rico Oversight, Management and Economic Stability Act" ("PROMESA"), 48 U.S.C. §§ 2101 *et seq*. and its Petition under said Title, through the undersigned attorney very respectfully SETS FORTH and PRAYS as follows:

## I.   INTRODUCTION

On August 25, 2017, Plaintiff United States of America (hereinafter "Plaintiff") commenced an action against Defendant Jose Luis Vaello Madero (hereinafter "Mr. Vaello-Madero" or "Defendant"), a Social Security Administration (SSA) Title XVI Supplemental Security Income (SSI) disability beneficiary, to collect, inter alia, $28,081.00 in overpaid SSI benefits after he moved to Puerto Rico. (**Docket No. 1**).  In the Complaint, Plaintiff alleges that the SSI is a Federal income supplement program funded by general tax revenues (not Social Security taxes), requiring the beneficiary to be a U.S. resident in order to benefit from it, thus excluding Puerto Rico.  (***Id*. at ¶ 2**).

On May 22, 2018, this Honorable Court issued an order inviting the Commonwealth to participate in this case as *amicus curiae*, or to otherwise intervene under F.R.C.P.  24 (**Docket**

**No. 39, p. 1, lines 19 – 22, p. 2, line 1**).  After formal notice of this Order was executed (*see* **Docket No. 41**), the Commonwealth accepted the Court's invitation, and therefore appeared in such a capacity (*see also* **Docket No. 46**)(citing FRAP 29(a)(2)-(3)).  (**Docket No. 47**).  Other amicus curiae appearances followed.  (**Docket Nos. 50, 61, 65**).

This case involves issues that shall indeed have a *portentous* impact on the residents of the Island, thus, of wide and general public importance to the nation and particularly to United States citizens residing in Puerto Rico, who are receiving a disparate treatment by being excluded from the SSI program for the sole reason of their status as resident of Puerto Rico, which finds its genesis in a line of early twentieth century cases known as the "Insular Cases".

## II.   ARGUMENT

### A.  Heightened Scrutiny Standard:

When legislation establishes a classification on which to base disparate treatment of particular groups of people, courts must scrutinize it to determine if it violates equal protection. *See Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 271-72 (1979). Depending on the classification at issue, courts apply different levels of review. *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439-441 (1985).

"Certain suspect classifications ─race, alienage and national origin─ require what the Court calls strict scrutiny, which entails both a compelling governmental interest and narrow tailoring. *Massachusetts v. United States HHS*, 682 F.3d 1, 8-9 (1st Cir. 2012) *(*citing *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 227 (1995)); *see also Cleburne*, 473 U.S. 432, 439-441 (suspect classifications are often "deemed to reflect prejudice and antipathy, a view that those in the burdened class are not as worthy or deserving as others," and because "such discrimination is unlikely to be soon rectified by legislative means."); *Washington v. Davis*, 426 U.S. 229, 239

2

(1976) (noting that a "central purpose" of equal protection "is the prevention of official conduct discriminating on the basis of race"). Gender-based classifications invoke intermediate scrutiny and must be substantially related to achieving an important governmental objective. Both are far more demanding than the rational basis review conventionally applied in routine matters of commercial, tax and like regulation. *United States HHS*, 682 F.3d at 9.

The exclusion of Puerto Rico residents from the SSI program is subject to a stricter standard of review than rational basis. *Consejo de Salud Playa de Ponce v. Rullán*, 586 F. Supp. 2d 22, 44 (D.P.R. 2008) (Gelpí, J.). By excluding Puerto Rico residents as a class, the SSA singles out and discriminates against an entire group of people on the premise that they belong to a class of "alien races." S*ee Bruns v. Mayhew*, 750 F.3d 61, 66 (1st Cir. 2014) ("[A] state's alienage-based classifications inherently raise concerns of invidious discrimination and are therefore generally subject to strict judicial scrutiny."). Because this exclusion serves no legitimate governmental end under any standard of review, it must fail. However, the constitutional interpretation crafted in the *Insular Cases* has been applied to justify unequal treatment of U.S. citizens residing in Puerto Rico.

**B.**    **Disparate treatment based on a suspect classification in violation of the Equal Protection of the Law.**

Puerto Rico became a United States territory as a result of the Spanish-American War in 1898, through the Treaty of Paris[1]. Since then, Congress has been tasked with determining "[t]he civil rights and political status of its inhabitants". Treaty of Paris, Art. 9, Dec. 10, 1898, 30 Stat. 1759.[2] At the time, it was assumed that the Constitution applied to the territories.[3] It was not until

---

[1] *Puerto Rico v. Sánchez Valle*, 136 S. Ct. 1863, 1868 (2016).
[2] *Id.*

the *Insular Cases*, beginning with *Downes v. Bidwell*, 182 US 244 (1901), that the notion of non-incorporated territories emerged. What was known as the "Incorporation Doctrine" provided the United States a legal basis to discriminate against residents of Puerto Rico in federal programs by not extending these benefits to Puerto Rico "so long as there is a rational basis for its actions". *Downes* and *Califano v. Torres*, 435 U.S. 1 (1978) and *Harris v. Rosario*, 446 U.S. 651 (1980), provided the basis for this unequal and irrational treatment based on race and national origin.

It has been historically understood that the U.S. Government may extend its borders, and that this power is vested upon Congress. In pertinent part, Article IV, section 3 of the U.S. Constitution states:

> **New states may be admitted by the Congress into this union**; but no new states shall be formed or erected within the jurisdiction of any other state; nor any state be formed by the junction of two or more states, or parts of states, without the consent of the legislatures of the states concerned as well as of the Congress.

> **The Congress shall have power to dispose of and make all needful rules and regulations respecting the territory or other property belonging to the United States; and nothing in this Constitution shall be so construed as to prejudice any claims of the United States, or of any particular state.**

The first paragraph is redacted in the context of the admission of new states and the second paragraph, attends the issue of territory and property. Notably, in the Northwest Ordinance of 1787, Congress established that the determining factor for admitting new states was the number of its "free inhabitants"[4], which refers to people. In contrast, the term "territory" seems to be applicable to the realm of real property,[5] and this is contextualized by the open

---

[3]*Thompson v. Utah*, 170 U.S. 343 (1898). This case was reversed by *Collins v. Youngblood*, 497 U.S. 37, 39 (1990), but on the basis of *Ex Post Facto* Clause interpretation.
[4] *Pollard v. Hagan*, 44 U.S. (3 How.) 212, 222 (1845), citing Article 5 of the Northwest Ordinance of 1787
[5] See definition of "land" according to BALLENTINE'S LAW DICTIONARY (Copyright (c) 2010 LexisNexis ®, a division of Reed Elsevier, plc.).

ended phrase "any other property belonging to" which is evidently confined to the context of "things" and not of people.

In interpreting the Territorial Clause of the U.S. Constitution, "[i]t was thought by Chief Justice Taney in the *Dred Scott* case, 19 How. 393, 436 (1857), that the sole object of the territorial clause was to transfer to the new government the property then held in common by the States, and to give to that government power to apply it to the objects for which it had been destined by mutual agreement among the States before their league was dissolved".[6] In that case, Justice Taney also expressed that "[a] power, therefore, in the General Government to obtain and hold colonies and dependent territories, over which they might legislate without restriction, would be inconsistent with its own existence in its present form".[7] Though the *Dred Scott* case erroneously limited the term "citizens" to a single race, it did not go as far as to interpret that the Territorial Clause may be applied to people, and that the U.S. Constitution allowed the Federal Government to hold "colonies and dependent territories".[8]

This traditional interpretation, which harmonized perfectly with the text of the U.S. Constitution, was abandoned in the *Insular Cases*, which mirror the categorizations made in the infamous case of *Plessy v. Ferguson*[9]. There the Court said that "[t]he object of the amendment was undoubtedly to enforce the absolute equality of the two races before the law, but in the nature of things it could not have been intended to abolish distinctions based upon color, or to enforce social, as distinguished from political equality, or a commingling of the two races upon

---

[6] *Downes v. Bidwell, supra.*
[7] *Scott v. Sandford*, 60 U.S. (19 How.) 393, 447-48 (1857).
[8] The words "people of the United States" and "citizens" are synonymous terms, and mean the same thing. *Scott v. Sandford*, 60 U.S. (19 How.) 393, 404 (1857).
[9] *Plessy v. Ferguson*, 163 U.S. 537, 544 (1896).

terms unsatisfactory to either.[10] These distinctions, which were rightly revoked by the Court in *Brown v. Board of Education*, 347 U.S. 483 (1954), are similar to the distinctions elaborated in the *Insular Cases*.

Specifically, *Downes* established the following treatment of Puerto Rico:

If those possessions are inhabited by **alien races**, **differing from us in religion, customs, laws, methods of taxation and modes of thought, the administration of government and justice, according to Anglo-Saxon principles**, may for a time be impossible; and the question at once arises whether large concessions ought not to be made for a time, that, ultimately, our own theories may be carried out, and the blessings of a free government under the Constitution extended to them. We decline to hold that there is anything in the Constitution to forbid such action.

We are therefore of opinion that the Island of Puerto Rico is a territory **appurtenant and belonging to the United States, but not a part of the United States** within the revenue clauses of the Constitution; that the Foraker act is constitutional, so far as it imposes duties upon imports from such island, and that the plaintiff cannot recover back the duties exacted in this case.[11]

In *Dorr v. United* States —a case that reiterated *Downes v. Bidwell*— the Court said that "[u]ntil Congress shall see fit to incorporate territory ceded by treaty into the United States, we regard it as settled by that decision that the territory is to be governed under the power existing in Congress to make laws for such territories and subject to such constitutional restrictions upon the powers of that body as are applicable to the situation."[12]

In the Jones Act of 1917[13], Congress, among others, granted United States citizenship to all inhabitants of Puerto Rico. This directly contradicts the holding of the *Downes* Court that Puerto Rico belongs to but is not a part of the United States, since Congress unequivocally established that the **People of Puerto Rico** are citizens of the United States and do not merely

[10] *Plessy v. Ferguson*, 163 U.S. 537, 544 (1896). [Revoked by *Brown v. Bd. of Educ.*, 347 U.S. 483 (1954)].
[11] *Downes v. Bidwell*, 182 U.S. 244, 286-87 (1901).
[12] *Dorr v. United States*, 195 U.S. 138, 142-43 (1904).
[13] *Jones Act of 1917, 64 P.L. 368, 39 Stat. 951, 64 Cong. Ch. 145, 64 P.L. 368, 39 Stat. 951, 64 Cong. Ch. 145*.

6

belong to it.  It would therefore seem clear that, if Puerto Ricans are citizens of the United States, they would be entitled to the same rights as all other United States citizens.  Unfortunately, in *Balzac v. Porto Rico*, 258 U.S. 298 (1923), the Court reaffirmed the distinction between incorporated and non-incorporated territories. That time the Court expressed that, although the intention by Congress to confer United States citizenship to a territory's inhabitants may be interpreted as its incorporation, and such was the case for Alaska, the situation of the Puerto Rico territory was different, in that Alaska is an "enormous territory, very sparsely settled and offering opportunity for immigration and settlement by American citizens"[14]

  This is an entirely arbitrary distinction. The geographical or demographic differences between Alaska and Puerto Rico do not explain why granting United States citizenship to Alaskans meant incorporation and granting such citizenship to Puerto Ricans did not.  The real reason the *Balzac* Court distinguished Alaska from Puerto Rico was illustrated by the Court as follows: "[w]hen Porto Ricans passed from under the government of Spain, they lost the protection of that government as subjects of the King of Spain, a title by which they had been known for centuries. They had a right to expect, in passing under the dominion of the United States, a status entitling them to the protection of their new sovereign".[15] This explanation, however, is pretextual, since, such a right of protection by their new sovereign would have accrued immediately upon the change of sovereignty, and not necessarily through a grant of United States citizenship.  In essence, the distinction is one entirely based **on alienage or racial and cultural differences**, as Puerto Ricans had been under Spanish rule for centuries. As stated before, such distinctions are subject to strict scrutiny under the Equal Protection Clause.

---

[14] *Balzac*, 258 U.S. at 309.
[15] *Balzac*, 258 U.S. at 308.

Further, in one of the earliest *Insular Cases*, *De Lima v. Bidwell*, 182 U.S. 1, 174, 21 S. Ct. 743, 744 (1901), the Court stated that there are two ways that the incorporation of a territory can be established by Congress: (i) it can be done by an extension of U.S. laws and institutions throughout the territory, and also, (ii) by an incorporation of the inhabitants into the Union.

On the first route, it should be noted that as a result of the extension of United States laws and institutions to Puerto Rico, the territory itself has been incorporated by congressional action.[16] With regard to the second route, the *Balzac* Court recognized that a law of Congress declaring an intention to confer political and civil rights on the inhabitants of the new lands as American citizens may be properly interpreted to mean an incorporation of it into the Union".[17] It also recognized that by being awarded U.S. Citizenship, Puerto Ricans would be enabled "to move into the continental United States and becoming residents of any State there to enjoy every right of any other citizen of the United States, civil, social and political".[18] This final statement depicts reality, but the proper conclusion would have been that the concession of U.S. Citizens to Puerto Ricans, was an act of "incorporating the inhabitants into the Union".

The main objections in *Balzac* to the idea that Congress incorporated Puerto Rico into the Union by granting citizenship to Puerto Ricans in the Jones Act were that: (i) the Jones Act of 1917, did not express the intention to incorporate the territory in its title and (ii) the Jones Act established a Bill of Rights instead of extending expressly the U.S. Bill of Rights, meaning the Amendments.[19] These objections are erroneous. First, although Congress has not used explicit language that Puerto Rico is an incorporated territory, its long sequence of legislative actions

---

[16] "The statutory laws of the United States not locally inapplicable, except as hereinbefore or hereinafter otherwise provided, shall have the same force and effect in Puerto Rico as in the United States…" 48 U.S.C.S. § 734. Moreover, many statutes passed by Congress include Puerto Rico in their definition of "State".
[17] *Balzac*, 258 U.S. 298 at 309.
[18] *Balzac*, 258 U.S. 298 at 308
[19] *Id.*

from 1900 to present has in fact incorporated the territory".[20] Second, as to Congress not directly extending to Puerto Rico the Bill of Rights, since the Northwest Ordinances of 1787 certain fundamental rights have been extended to and required from new territories based on the pre-*Insular Cases* understanding that the Constitution applied wherever Congressional action was present, so that this distinction is meaningless.

Even if Congress could validly treat Puerto Rico differently as a territory, the question remains whether Congress may treat United States **citizens** differently on the basis of their racial and cultural differences. It should be underlined in this context that "[w]ith the exception of two of its members, all justices of the Court that decided the *Insular Cases* had in 1896 also joined the Court's decision in *Plessy v. Ferguson*".[21] The Commonwealth asserts that the notion of a territory being "unincorporated" for cultural and racial differences would rightfully offend our nation's post *Brown v. Board of Education* view of equality before the law. However, the courts have kept away from engaging in this discussion, perhaps awaiting the right case. If so, we respectfully suggest that this is such a case.

In this case, defendant's residency in Puerto Rico was the only reason for denial of SSI benefits. Specifically, in a brief *Per Curiam* opinion in *Califano v. Torres*, the Court validated the geographical limitations on SSI benefits,[22] and decided that such a regulation was not unconstitutional so long as there is a rational basis for it.[23]  This expression by the Court was

---

[20] *Consejo de Salud v. Rullán*, 586 F. Supp. 2d 22, 41 (D.P.R. 2008).
[21] *Consejo de Salud*, 586 F. Supp. 2d 22, 28.
[22] 42 U.S.C.S. § 1382 **(e)** For purposes of this title [42 USCS §§ 1381 et seq.], the term "United States", when used in a geographical sense, means the 50 States and the District of Columbia.
[23] *Califano v. Torres*, 435 U.S. 1, 5 (1978)

later reaffirmed in *Harris v. Rosario*.[24] Under this relaxed standard, a law is constitutionally valid if "there is a plausible policy reason for the classification, the legislative facts on which the classification is apparently based rationally may have been considered to be true by the governmental decision maker, and the relationship of the classification to its goal is not so attenuated as to render the distinction arbitrary or irrational." *Armour v. City of Indianapolis, Ind.*, 566 U.S. 673, 681 (2012) (citations omitted).

However, the analysis performed above of the *Insular Cases*, upon which both *Torres* and *Rosario* were based, clearly indicates that these decisions were entirely based on alienage and/or racial and cultural differences, and therefore the statutes in question should have been subjected to strict scrutiny and examined with a presumption of unconstitutionality. On this matter the Court has explained that:

> A core purpose of the Fourteenth Amendment was to do away with all governmentally imposed discrimination based on race. See *Strauder* v. *West Virginia*, 100 U.S. 303, 307-308,310 (1880). Classifying persons according to their race is more likely to reflect racial prejudice than legitimate public concerns; the race, not the person, dictates the category. See *Personnel Administrator of Mass.* v. *Feeney*, 442 U.S. 256, 272 (1979). Such classifications are subject to the most exacting scrutiny; to pass constitutional muster, they must be justified by a compelling governmental interest and must be "necessary . . . to the accomplishment" of their [*433] legitimate purpose, *McLaughlin* v. *Florida*, 379 U.S. 184, 196 (1964). See *Loving* v. *Virginia*, 388 U.S. 1, 11 (1967).[25]

It has been reiterated that "[t]he liberty protected by the Fifth Amendment's Due Process Clause contains within it the prohibition against denying to any person the equal protection of the laws. *See Bolling*, 347 U.S., at 499-500; *Adarand Constructors, Inc.* v. *Peña*, 515 U.S. 200, 217-218 (1995). While the Fifth Amendment itself withdraws from Government the power to

---

[24]*See Harris*, 446 U.S. at 653-54 (Justice Marshall Dissenting) questioning the validity of some earlier opinions by the Supreme Court—*Downes* and *Balzac*— suggesting that various protections of the Constitution do not app;ly to Puerto Rico, citing *Torres* v. *Puerto Rico*, 442 U.S. 465, 475-476 (1979)  (BRENNAN, J., concurring in judgment).
[25] *Palmore v. Sidoti*, 466 U.S. 429, 432-33 (1984).

degrade or demean in the way this law does, the equal protection guarantee of the Fourteenth Amendment makes that Fifth Amendment right all the more specific and all the better understood and preserved".[26] It should be stressed that "[t]he Equal Protection Clause directs that "all persons similarly circumstanced shall be treated alike." *F.S. Royster Guano Co.* v. *Virginia*, 253 U.S. 412, 415 (1920)".[27] In this matter, Puerto Ricans are similarly situated to other United States citizens. In *Harris v. Rosario*, these questions were cursorily addressed without benefit of briefing or argument.[28] Decades later, American citizens residing in Puerto Rico deserve a fresh look at the basis for this discrimination.

On the Equal Protection issue, the Court has stated that inhabitants of territories, "even if regarded as aliens, they are entitled under the principles of the Constitution to be protected in life, liberty and property". *Downes v. Bidwell*, 182 U.S. at 283. The Court's decisions have established that classifications based on alienage, like those based on nationality or race, are inherently suspect and subject to close judicial scrutiny. Aliens as a class are a prime example of a 'discrete and insular' minority (see *United States* v. *Carolene Products Co.*, 304 U.S. 144, 152-153, n. 4 (1938)) for whom such heightened judicial solicitude is appropriate. Accordingly, it was said in *Takahashi*, 334 U.S., at 420, that 'the power of a state to apply its laws exclusively to its alien inhabitants as a class is confined within narrow limits.'" *Graham v. Richardson*, 403 U.S. 365, 371-72 (1971). This analysis was not applied in *Harris.*

Further, the supposedly rational basis identified by the Court was that: "Puerto Rican residents do not contribute to the federal treasury; the cost of treating Puerto Rico as a State

---

[26] *United States v. Windsor*, 570 U.S. 744, 774 (2013).
[27] *Plyler v. Doe*, 457 U.S. 202, 216, (1982).
[28] *Harris v. Rosario*, 446 U.S. at, 653-54 (Justice Marshall Dissenting).

under the statute would be high; and greater benefits could disrupt the Puerto Rican economy." *Harris*, 446 U.S. at 652. . These premises are erroneous.

First, this Honorable Court can take judicial notice of the fact that many residents of Puerto Rico **do** pay federal taxes, some of which residents of other jurisdictions do not pay.[29] Federal law generally requires individuals and businesses in Puerto Rico to pay federal tax on income they earn outside of Puerto Rico, whether in the United States or in a foreign country. Federal law also requires employers and employees in Puerto Rico to pay all federal payroll taxes, which fund Social Security, the Medicare hospital insurance program[30], and the federal unemployment compensation program

Further, in general terms, "SSI makes monthly payments to people who have low income and few resources, and who are: Age 65 or older; blind; or disabled".[31] Also, "SSI is commonly known as a program of 'last resort' because claimants must first apply for all other benefits for which they may be eligible; cash assistance is awarded only to those whose income and assets from other sources are below prescribed limits".[32] Thus, the SSI program clearly aims at individuals who do not pay Federal income taxes because their income is too low. Moreover, the beneficiaries of SSI do not pay federal taxes, regardless of the state they reside in. Additionally, even non-citizens may qualify for SSI benefits from which the U.S citizens of Puerto Rico are

---

[29] For example, premiums on policies issued by insurers and reinsurers from Puerto Rico for risks located in Puerto Rico pay a federal excise tax ranging from 1% to 4% which is inapplicable in the remaining U.S. jurisdictions. *See* 26 U.S.C. § 4371.
[30] 26 U.S.C. §§3101, 3121 (b)(i) and 3121 (e)(1)
[31] SSI Booklet: https://www.ssa.gov/pubs/EN-05-11000.pdf.
[32] *Cash Assistance for the Aged, Blind, and Disabled in Puerto Rico* Congressional Research Service, October 26, 2016, Page 1. https://fas.org/sgp/crs/row/cash-aged-pr.pdf.

excluded.[33] In fact, in 2017, 6% of all SSI beneficiaries were noncitizens.[34] In 1995, that percentage was as high as 12.1% which represented a total of 785,410 beneficiaries.[35] .

Moreover, the residents of the Northern Mariana Islands, an unincorporated territory, do receive SSI benefits.[36] The objection to extending SSI benefits to Puerto Rico because they do not pay Federal income taxes should also apply to the Northern Mariana Islands.[37] According to the U.S. Governments Accountability Office (GAO),[38] in 2010, Puerto Rico taxpayers reported paying $20 million to the United States, its possessions, or foreign countries in individual income tax. "According to officials from Puerto Rico's Department of Internal Revenue, most of these payments would have been to the United States. The report also explains that "[i]f Puerto Rico had been a state in 2010, estimated individual income tax revenue from Puerto Rico taxpayers would have ranged from $2.2 billion to $2.3 billion (after accounting for estimated payments in excess of tax liability from refundable tax credits, such as the earned income tax credit)".[39] Also, the 2015 Internal Revenue Service Data Book reveals that the IRS collected $3.52 billion in federal taxes on individuals and businesses in Puerto Rico in Fiscal Year 2015.[40]

In terms of corporate income tax, in 2009, U.S. corporations paid about an estimated $4.3 billion in tax on income from their affiliates in Puerto Rico".[41] "If Puerto Rico had been a state in 2009, estimated corporate income tax revenue from businesses that filed a Puerto Rico tax return

---

[33] Supplemental Security Income for Non-Citizens. https://www.ssa.gov/pubs/EN-05-11051.pdf.
[34] SSI Annual Statistical Report, 2017, https://www.ssa.gov/policy/docs/statcomps/ssi_asr/2017/sect05.pdf.
[35] *Id.*
[36] *See Cash Assistance for the Aged, Blind, and Disabled in Puerto Rico*, Congressional Research Service, October 26, 2016, Page 3. https://fas.org/sgp/crs/row/cash-aged-pr.pdf.
[37] *See Congressional Task Force on Economic Growth in Puerto Rico,* Report to the House and Senate, December 20th, 2016, at 54.
[38] U.S. Governments Accountability Office, GAO-14-31.
[39] *Id.*
[40] *See* Internal Revenue Service Data Book, at page 12, Table 5. Retried on July 25, 2016 fromhttps://www.irs.gov/pub/irs-soi/15databk.pdf.
[41] *Id*

for that year (or their parent corporations in the United States) would have ranged from $ 5.0 to $ 9.3 billion.[42] Comparing this to SSI benefits, if Puerto Ricans qualified, the "estimated federal spending would have ranged from $ 1.5 billion to $ 1.8 billion".[43]

This information demonstrates that, although United States citizens residing in Puerto Rico do not pay federal income taxes like those in the states, it is entirely incorrect that they "do not contribute to the federal treasury", as the Court stated in *Harris*. The information provided by the GAO, presented above, also disproves the belief that treating Puerto Rico as a state under this statute would be too costly.

The third factor, regarding the supposed disruption of Puerto Rico's economy, differs from the current economic facts. According to another recent Governments Accountability Office report, the issue of lack of SSI, and other federal benefits in general, has been seen by different political administrations as attributing to "outmigration" to the states, which actually adversely affects the economy.[44] The only scenario in which such a benefit may disrupt the economy is if it disincentives work. However, the beneficiaries of the SSI program are elderly and/or disabled, and thus generally unable to work anyway. Second, if this was a problem in the application of the SSI program, it would present itself wherever the SSI was implemented, not just Puerto Rico. Therefore, it **does not justify**, even under a rational basis standard, the exclusion of U.S citizens in Puerto Rico from the SSI program. A group of American citizens with a population higher than 19 States, the District of Columbia, and all other territories is being subjected to an inferior standard of review and no disability benefits under the SSA just because

---

[42] *Id.*
[43] *Id.*
[44] *Factors Contributing to the Debt Crisis and Potential Federal Actions to Address Them*, GAO-18-387 Page 27, May 2018. https://www.gao.gov/assets/700/691675.pdf.

of Puerto Rico's classification as an "unincorporated territory", which is constitutionally unacceptable.

### III.    CONCLUSION

The Commonwealth respectfully submits that the exclusion of U.S. citizens living in Puerto Rico from receiving SSI benefits should be subject to strict scrutiny under the Equal Protection Clause of the Fifth and Fourteenth Amendments. The Incorporation Doctrine generated by the *Insular Cases* creates an impermissible suspect classification of U.S. citizens for alienage and/or racial and cultural reasons that is constitutionally impermissible. The distinction amongst U.S. citizens using the incorporated and unincorporated territory distinction as a foundation for discrimination is shockingly similar to the idea of "separate but equal." The notion of the Territorial Clause applying to people, is anachronistic and should be abandoned by the Court. Even under a more relaxed scrutiny, there is no rational basis to support the disparate treatment in the legislation currently in effect on the basis of ethnicity and race. Therefore, the denial to Defendant of SSI benefits in this case is unconstitutional.

**WHEREFORE**, the appearing amicus curiae Government of Puerto Rico very respectfully requests this Honorable Court to take notice of the above-stated and in considering this case on its merits, put an end to the economic and moral injustices created by an unconstitutional and the democratic deficit that exists in the US-Puerto Rico relationship and which perpetuates and fosters the discriminatory treatment of United States citizens in Puerto Rico in programs such as the one at issue in this case.

**RESPECTFULLY SUBMITTED.**

In San Juan, Puerto Rico on this 7th day of November, 2018.

IT IS HEREBY CERTIFIED that on this same date, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all parties.

WANDA VÁZQUEZ GARCED
Secretary of Justice

WANDYMAR BURGOS-VARGAS
Deputy Secretary of the General Litigation Office

*s/Susana I. Peñagarícano-Brown*
**SUSANA PEÑAGARICANO-BROWN**
USCA-PR No. 219907
Director of Federal Litigation
and Bankruptcy Division

*s/Carlos Lugo-Fiol*
**CARLOS LUGO-FIOL**
USCA-PR No. 41677
E-mail: clugofiol@gmail.com

Department of Justice of Puerto Rico
P.O. Box 9020192
San Juan, PR  00902-0192
Office (787) 721-2900, Ext. 2650
Fax. (787) 723-9188
Email: spenagaricano@justicia.pr.gov